[No. 28773. Department Two. August 20, 1942.]

THE STATE OF WASHINGTON, *on the Relation of Constantine N. Pulakis, Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY, *Respondent.*[1]

[1]Reported in 128 P. (2d) 649.

508

*Christ D. Lillions,* for relator.

*B. Gray Warner* and *Wm. R. Bell,* for respondent.

BEALS, J.—Constantine N. Pulakis applied to this court for a writ of certiorari to review an order of the superior court for King county, finding that Mary Pulakis is a delinquent child and that her father, the relator herein, failed to provide maintenance, training, and education for his daughter, and committing Mary Pulakis to the state training school for girls. An alternative writ having been issued, a complete return was filed by respondent judge, and the matter was thereafter argued and submitted to the court for determination.

Constantine and Grace Pulakis were for many years husband and wife. They were married in Greece, where their three eldest children were born. In 1903 they came to the United States, and in 1912 established their residence in the city of Seattle, where their youngest daughter, Mary, was born March 7, 1925. Mr. and Mrs. Pulakis had seven children, two boys and five girls, of whom six are now living, two boys and four girls, one daughter, Mrs. Chelos, having died several years after her marriage. She was survived by her husband (who married a second time) and several children. One of the Pulakis boys, Nick, about twenty-one

years of age, was always a problem child, was continuously in trouble, and frequently in jail. A daughter, Martha, was often in difficulties, and in 1940 was sent to the state training school for girls. One daughter, Vivian, married Pete Backlezos prior to 1930, and with her husband and three daughters resides in the city of Everett, where her husband conducts a shoe repairing business. Mary's father was employed as a carpenter, working diligently at his trade. The mother never learned to speak English fluently, and it would seem that the parents never thoroughly adjusted themselves to the American way of life.

Apparently, Mary was not the subject of any complaint on the part of anyone during her course in grade school, where she was considered "a good citizen," or during her first year in high school. During the early fall of 1941, when Mary commenced her sophomore year at the Franklin high school, her mother was very ill, her sickness resulting in her death the latter part of October.

During the month of September, 1941, Mary was absent from school on six different occasions, and the excuses she offered were by the school authorities deemed unsatisfactory. Two of Mary's nieces, the Chelos girls, were in school with her and her sister Martha, and apparently Mary and the younger of these girls, Frances Chelos, were absent, probably playing truant together.

The attendance department of the school district proceeded to investigate the situation, and, concluding that they were unable to accomplish a satisfactory solution, referred the matter to the juvenile department of the superior court. From the reports made by the school authorities, it is evident that, in considering the problem of Mary, they were much influenced by the school history of her elder sister Martha, and her

brother Nick, whose personal and school records were, beyond question, bad. In this connection, it should be noted that, from beginning to end, the record contains no intimation that Mary had been guilty of any moral delinquency of any sort or description. She was simply a rather poor student, and in September, 1941, played truant.

The matter having been brought before the juvenile court, Mary was committed to the House of the Good Shepherd, in Seattle. Two weeks thereafter, her mother having become seriously ill, Mary was permitted to leave the institution to go to Everett, where her mother was sick in a hospital. A few days later, Mrs. Pulakis died, Mary remaining in Everett at the home of her sister, Mrs. Backlezos.

Shortly thereafter Mary wrote Judge Long a letter, as follows:

"I thought I would drop you a few lines to tell you that I would like very much to attend Everett High School. I guess I was foolish to think that I could quit school at 16.

"Here in Everett, I am away from all the bad influence people.

"You really don't know what those two weeks at the House of Good Shepherd did to me. I have been really reformed.

"Mother's death sure showed me that I lost my one best friend in this world. It was a great shock to Martha and me both.

"Please, Judge, will you kindly give me a permit to attend Everett High School, as I am very anxious to go to school, and I'm looking forward for a good education.

"Please answer me, Judge, and may it all be for the best."

This letter remaining unanswered, Mrs. Backlezos wrote Mr. E. D. Manolides, a member of the Seattle bar then acting as deputy prosecuting attorney, stating that a letter had been written her father, inform-

ing him that Mary should return to the House of the Good Shepherd. Mrs. Backlezos stated that she and her husband would like to give Mary a home with them, and that they would take good care of her and see that she entered and attended the Everett high school, provided the King county juvenile court permitted.

December 1st, Mrs. Backlezos wrote again to Mr. Manolides, calling attention to her previous letter, and asking Mr. Manolides to see if the arrangement could be made. December 2nd, Mr. Manolides wrote Mrs. Backlezos as follows:

"I am in receipt of both of your letters and I have acted in the matter although I did not write to you sooner. Miss Kelly of the Catholic Society was out of town and this is the reason for the delay.

"I just saw Judge Long and I gave him your letters; also Mary's letter. You can count on having Mary stay with you and you will be hearing favorably soon from the Juvenile authorities.

"Judge Long asked me about your fitness to look after Mary and I highly recommended you to him. Tell your little sister to be good; otherwise, she will be throwing you down.

"I wish to commend you in your efforts for the welfare of your young sisters and hope that you will be rewarded with success."

December 11th, Mary wrote Mr. Manolides, thanking him for his effort on her behalf, and stating that she was happy, and would faithfully obey her sister.

Not unnaturally, Mrs. Backlezos and Mary, before undertaking to enter Mary in the Everett high school, which would undoubtedly have required a clearance from the high school which Mary had attended in Seattle, awaited the word from the juvenile court which Mr. Manolides had stated would be forthcoming. No such word ever came, and Mary remained in Everett until sometime in February, when, her father having

fallen sick, Mary, at his request, went to Seattle over weekends to assist him in conducting his household. On one occasion, she remained in Seattle a week, and some of the school authorities seeing her there, reported her nonattendance at school. Mary was thereupon taken into custody by the court authorities, and recommitted to the House of the Good Shepherd. Her father entering some objection to this institution on the ground of religion, a full hearing was had before the court, and testimony taken, with the result that an order was entered committing Mary to the state school for girls, this being the order now before us for review.

We shall now consider the evidence upon which the order was based. From a written report to J. C. Kelly, chief probation officer, made by H. A. Cook, supervisor of attendance, dated April 16, 1940, referring to delinquencies on the part of Mary's sister Martha and her brother Nick, it appears that both children had been serious problems, and that several times Nick had interfered when Martha was reprimanded by her teachers, and had threatened "to get" the teachers. The report also states that the children's mother spoke English imperfectly, and did "not understand customs or regulations in this country." It was reported that the mother's attitude was defiant, and that she had said "this was a free country and if the children wanted to be truant some times, why not?" It is also stated that the mother concealed the children's delinquencies from their father. This statement may have referred to the Chelos family, the witnesses continually confusing the individuals and families.

Concerning Mr. Pulakis, the relator herein, the report states that he does not understand the school system here, he having obtained his schooling in Greece, "but he is cooperative and seems to want his children to do right." This matter is relevant as showing the

natural tendency on the part of the school authorities to regard all the children as problems, as showing the disposition of the mother to support the children, and the contrary disposition of the father, who appeared anxious to cooperate with the school authorities.

After Mary's truancy, the school authorities proceeded to investigate the situation. Miss Marguerite E. Bringloe, a home visitor, reported in writing to Mr. Kelly, under date October 2, 1941. The report states that "Mary was considered a good citizen in the John Muir school and last year at Franklin seemed to be adjusting very well." The report also stated that Mary was absent from school six days without satisfactory excuse, and that she and her niece Frances were "showing symptoms of the same sort of maladjustment as their older sisters."

Mr. Cook, the supervisor of attendance who made the report on Martha Pulakis above referred to, testified that he was acquainted with Mary, and *inter alia,* that "she has been irregular in attendance over a number of years." In making this statement, the witness was probably confusing Mary with Martha, as it does not appear that Mary had been particularly irregular in attendance at school, save as above referred to. The witness testified at considerable length concerning difficulties with other Pulakis children, and with the Chelos girl, and that the families have not been particularly cooperative.

Mrs. Martha Castberg, an officer of the probation department, testified that she was acquainted both with Mary and her sister Martha; that she had visited their home and talked with their mother, her first call having been made at the request of Mr. Pulakis, who evidently had taken up with the authorities the difficulty he had experienced in keeping the children in school. The witness talked with both Martha and Mary, the

principal difficulty at the time being evidently with the older girl. The witness made one call on Mary after the latter returned from her sister's home in Everett.

Miss Margaret McCarney, girls' adviser at Franklin high school, testified that Mr. Pulakis had called upon her, and that "he was always most cooperative and wanted to do the best he could for his children." The witness became confused as to the home situation, referring to the death of the mother of the Chelos girls as the death of Mrs. Pulakis. The witness stated that Mary was "not of an academic mind, as far as our school is concerned." The witness regarded the Pulakis and Chelos children as problems, but it does not appear that her information concerning Mary was particularly definite. It is clear, however, from her testimony, that Mr. Pulakis was cooperative, and several times had consulted the school authorities in an endeavor to help his children.

Mr. J. C. Kelly, chief probation officer of the juvenile court, testified that he was acquainted with Mary, and was aware of the fact that Mr. Pulakis had had difficulty in controlling his children. He also testified that, when Mary was released from the House of the Good Shepherd, he talked to Mr. Manolides concerning the suggestion that Mary remain with her sister in Everett, and that such an arrangement was in fact made, but that further difficulty resulted when Mary came back to Seattle.

The superintendent of the Martha Washington school, a parental school for problem girls, maintained as a part of the public school system of Seattle, testified that Frances Chelos, who was committed to that institution at the same time Mary Pulakis was first sent to the House of the Good Shepherd, was discontented there because she knew that Mary was not attending school.

A neighbor of the Backlezos family testified that she was well acquainted with them, and considered Mary, whom she had known for several years, to be a good and obedient girl. The witness spoke highly of Mr. and Mrs. Backlezos and their children, who attended Sunday School and belonged to the Camp Fire Girls. Another neighbor testified to the same effect, stating that a home with her sister would afford Mary an excellent opportunity to develop. Another friend and neighbor of the Backlezos family in Everett testified that she had known Mary since she was a small child, and that Mary was a friend of her own daughters and was well regarded.

Two ladies who resided near the Pulakis home in Seattle testified to Mary's character and excellent behavior, one stating that she had sometimes employed Mary to take care of her baby, stating, concerning Mary:

"A. Well, I think she is a fine, decent girl. I have seen her help her mother when she was ill. She works good, and I have never seen her do anything wrong, smoke or swear or any of those things, and I certainly trust her. I think a lot of her or I wouldn't have her mind my baby. I had trouble with my teeth after the baby was born, and Mary took care of the baby for me then. And she was absolutely alone in the house. She took good care of the baby, fed her and everything. Q. She took good care of your baby? A. Real good care. Just as well as an older lady. Q. What was her attitude toward her mother and father? A. Very good. Q. Would she mind them? A. Yes. She helped the mother all the time with the work and the cooking. Q. What was the physical condition of her mother? A. Well, she wasn't very well. She had trouble with her eyes. She could hardly see, and she had trouble with her leg. It got so she couldn't come visit me because she couldn't walk, and she had terrible headaches. She was quite ill. Q. Who was taking care of the house? A. Mary."

Mr. Backlezos testified that, while residing in his home, Mary was a good girl, and a fit companion for his daughters; that he was willing to have Mary reside in his home, and would be responsible for sending her to school; and that he would in all respects cooperate with the authorities. He also said that, if Mary did not prove obedient and cooperative, he would report to Mr. Kelly.

As to the law governing the situation presented, relator contends that the court erred in exercising jurisdiction over Mary, upon complaint of the school authorities that she was absent without proper excuse. This contention is without merit. Pursuant to Rem. Rev. Stat., § 1987-1 [P. C. § 593] *et seq.*, the court had jurisdiction to hear and determine the matter of Mary's alleged delinquency.

As to the requirement that Mary attend school, Rem. Rev. Stat., § 5072 [P. C. § 5219], provides that a child shall attend school up to his sixteenth birthday, unless lawfully employed, etc., while Rem. Rev. Stat., § 4907 [P. C. § 5230-2], reads as follows:

"All minors of the state residing or employed in school districts of the state in which part-time schools are maintained, as hereinafter provided, shall attend school until the age of eighteen (18) years unless (1) they are graduates from a four year high school course or its equivalent, (2) they are in a part-time school and are employed in accordance with the terms of any state or federal act regulating the employment of such minors under the age of eighteen (18) years, (3) shall have been excused from school attendance in accordance with the provisions of this act."

For the purpose of this case, we assume that, under the section last quoted, Mary was required to attend school until she reached the age of eighteen years.

In the order appealed from, the trial court found that

" . . . Mary Pulakis is a delinquent child within the meaning of the law; that the said child has violated the school law; that the father, Constantine Pulakis, has failed to provide proper maintenance, training and education for the said child, and the welfare of the said child requires that her custody be taken from the said father."

It may be assumed that Mary did violate the school law by absenting herself from Franklin high school, without adequate excuse. A more difficult question is whether the court's finding that her father failed in his duties and should consequently lose the custody of his daughter, is supported by the record. The record contains absolutely no suggestion of any moral delinquency on Mary's part. She testified that she did not smoke, and several persons intimately associated with her testified that they never saw her smoke. Apparently she observed proper hours, and it nowhere appears that she kept bad company. Undoubtedly she did cause trouble, both in the Franklin high school and the Martha Washington school, by allowing the students there to become aware of the fact that she was not attending school. It is evident, however, that the school authorities, in considering Mary's case, were largely influenced by the delinquencies of her brother Nick and her sister Martha. It does not, however, appear that Mary had been affected by the evil influence of these two members of her family.

Of course, many demands are made upon the time of the school authorities. They have much to do, and undoubtedly cannot devote as much time and attention to each individual case as many of the cases should receive. It is very unfortunate, however, that no one, at the time of Mary's truancy from Franklin high school, contacted her father, relator herein. All the authorities agree that he was always cooperative and anxious that his children conform to proper school rules

and regulations. At this time, Mary's mother was ailing and undoubtedly wanted Mary's assistance in the housework, and evidently had no great sympathy with the law which required Mary to attend school until she reached the age of eighteen years. It does not appear, however, that at this time Mary's truancy was called to the attention of her father.

Constantine Pulakis testified that he is an American citizen; that he owns his own home, where he has resided for nineteen years; that he earns between two hundred and two hundred fifty dollars per month, working at his trade. It is evident from the entire record that he is a sober, industrious citizen.

In the case of *State ex rel. Helwig v. Superior Court,* 176 Wash. 478, 29 P. (2d) 930, an order committing three boys to the state training school was reversed, because of the trial court's failure to find that the parents were not fit and proper persons to have custody of their children. In the course of the opinion, we said:

"The order of commitment is erroneous. Without their consent, parents or legal guardians of children can not be deprived of the right to the care, custody, society and services of their children unless there is a showing and a finding by the court that such parents or guardians are incapable or have failed or neglected to provide for such children and to perform their duties to such children.

" 'No dependent or delinquent child as defined in this act shall be taken from the custody of its parent, parents or legal guardian, without the consent of such parent, parents or guardian, unless the court shall find such parent, parents or guardian is incapable or has failed or neglected to provide proper maintenance, training and education for said child.' Rem. Rev. Stat., § 1987-14."

The reluctance of this court to take a child from the parent is evidenced by our opinion in the case of *State*

*ex rel. Everitt v. Superior Court,* 178 Wash. 90, 33 P. (2d) 897.

It appears that the trial court was strongly influenced by the situation as it existed after the death of Mary's mother, being of the opinion that some steps should have been taken by Mrs. Backlezos and Mary to cause the latter to be entered as a student in Everett high school.

It would seem, however, that the authorities are not altogether free from blame for the fact that Mary did not enter this school. Mary herself wrote to the judge the letter above quoted. At this time she was on parole, as testified to by Mr. Kelly, from the House of the Good Shepherd in Seattle. She testified that she was of the opinion that she could not be received as a student in the Everett high school until she could, together with her application, present some sort of a clearance from the juvenile court in whose custody she undoubtedly was at that time. It would also be necessary for her to present some sort of a record from Franklin high school as to her status in that institution, and it would seem that the school authorities would not take any steps in the matter while Mary was under the jurisdiction of the juvenile court, without authority from that tribunal. No answer to Mary's letter having been received, Mrs. Backlezos wrote her friend, Mr. Manolides, under date November 17th, and not hearing from him, wrote again December 1st, to which letter she received the letter above quoted. In this letter, Mr. Manolides directly stated that "you will be hearing favorably soon from the juvenile authorities," but no word was sent.

It appears beyond question that Mr. and Mrs. Backlezos are substantial citizens, respected in their community, maintaining a good home, and in every way fit and proper persons to have charge and custody of Mary Pulakis.

Assuming that Mrs. Backlezos, Mary, or Mr. Pulakis might well have again called the matter to the attention of the court, and are subject to some criticism for not having done so, we are nevertheless of the opinion that the order depriving relator of the custody of his daughter and committing her to the state training school is not supported by the record in the case. If at the hearing Mary or her father had evidenced opposition to Mary's further attendance in school, or if any evidence whatever had been introduced even tending to prove that Mary was in danger of becoming morally delinquent, a different situation would be presented, but the contrary is the fact. Apparently Mary was perfectly willing to enter the Everett high school, and her sister and her father desired that she do so. Her only mistake was in waiting too long to receive the clearance from the court that Mr. Manolides had written them would be forthcoming. The record contains no challenge whatever to the statements made by Mr. Manolides in his letter. The record shows that he discussed the matter with the judge, and Mr. Kelly testified that

" . . . Mr. Manolides talked to me about the possibility of the girl remaining with the sister in Everett. Eventually that arrangement was made, and it was understood that she would be considered on parole from the House of the Good Shepherd."

Of course, Mary's truancy from the Franklin high school justified action by the school authorities. In this connection, however, it must be remembered that, at the time, Mary's mother was sick and probably largely incapacitated from performing necessary household duties. It does not appear that Mary's half dozen unexcused absences would justify classing her as an habitual truant, as referred to in Rem. Rev. Stat., § 1987-1 [P. C. § 593] (14), or under § 5076 [P. C. § 5223]. The subparagraph of § 1987-1 referred to in-

dicates that, in order to be classed as a dependent or delinquent child, a more serious situation must be presented than is disclosed by the record before us. If at the time of Mary's truancy, Mr. Pulakis had refused to exert his parental authority by compelling Mary to regularly attend school, or if it had developed that he was unable to compel her attendance, or if while attending school she had proved to be a problem child and troubled the school authorities, a different situation would have existed. In this connection, it should be noted that it does not appear that the school authorities complained of Mary's conduct while in school. Her unexcused absence was apparently the sole difficulty.

While Mary's failure to attend school in Everett was undoubtedly wrongful and in violation of the court's understanding of the situation, under all the circumstances, her failure to attempt to enroll in the Everett high school cannot be considered such a wrongful act as to support the order appealed from.

Courts have always been in sympathy with the laws requiring children within certain ages to attend school, and the school authorities and juvenile courts are required to enforce these laws. It is, however, a very serious matter to take a child like Mary from the custody of her father and commit her to the state school for girls. The situation did not require such drastic action.

In the case of *State ex rel. Berry v. Superior Court*, 139 Wash. 1, 245 Pac. 409, 45 A. L. R. 1530, this court reversed an order of the superior court entered pursuant to the verdict of a jury, declaring that a minor was a delinquent child, and sentencing him to the state training school. It appeared that the minor had twice violated a city ordinance regulating the speed of automobiles, and on another occasion had been guilty of

reckless driving which resulted in the injury of two passengers in the car driven by the minor. While apparently this court was convinced that the minor was an extremely reckless driver, the judgment appealed from was reversed, with instructions to enter an order forbidding the minor to operate a motor vehicle for the period of one year. In the course of the opinion, we said:

"It seems to us that the order committing relator to the state training school was too drastic under the circumstances. Wide discretion is given the court to determine what is for the welfare of a minor, but we think no minor should be taken from the parental influence, unless there is something to indicate that the influence is improper, that the surroundings are not good, or that there is danger to the minor's morals.

"This is not a case in which the minor has committed acts of moral turpitude, nor violated the laws under conditions which indicate a consent or acquiescence upon the part of the parents; nor is there anything to indicate that the parents are negligent in their duty towards the training of the relator. The purpose of the juvenile law is to prevent minors from growing up to lead an idle, dissolute or immoral life."

The primary purpose of the laws relating to minors, which are pertinent to this inquiry, is not to punish a so-called delinquent child, but rather "to give to the weak and immature a fair fighting chance for the development of the elements of honesty, sobriety and virtue essential to good citizenship." *In re Lundy*, 82 Wash. 148, 143 Pac. 885.

In the case at bar, the situation in the Pulakis home cannot be said to have been so bad as to justify Mary's removal therefrom. It affirmatively appears, with no evidence to the contrary, that Mr. and Mrs. Backlezos maintain a home admirable in every way. They have expressed their desire to have Mary become a member of their family, and state that they will see that she

conducts herself properly and attends school. This would seem to offer a satisfactory solution of the problem of Mary, if the situation remains unchanged.

The order under review is reversed, with instructions to the trial court to direct that Mary live either with her father or Mr. and Mrs. Backlezos, with permission to enroll as a student in either a Seattle high school, or one in Everett.

Of course, if Mary should prove recalcitrant and fail and refuse to enter school, or, after entering, fail to attend unless prevented by some good and sufficient reason, the court may take such steps as seem necessary, this decision being entirely without prejudice to any future action which may be proper.

ROBINSON, C. J., MILLARD, BLAKE, and JEFFERS, JJ., concur.

[1]Reported in 128 P. (2d) 661.